# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CSS ANTENNA, INC. | : | |
| | : | |
| v. | : | Civil No. CCB-09-2008 |
| | : | |
| AMPHENOL-TUCHEL ELECTRONICS, GMBH | : | |
| | : | |

## MEMORANDUM

CSS Antenna, Inc. ("CSS") has sued Amphenol-Tuchel Electronics, GmbH ("ATE") for breach of contract, breach of express warranty, and breach of implied warranty of fitness for a particular purpose. Now pending before the court is the defendant's motion to dismiss for lack of personal jurisdiction and improper venue. In the alternative, the defendant moves to transfer venue to the United States District Court for the Eastern District of Michigan or for dismissal under the doctrine of *forum non conveniens*. The motion has been fully briefed, and oral argument was heard on January 21, 2011. For the following reasons, the defendant's motion will be denied.

## BACKGROUND

ATE, which is based in Heilbronn, Germany, manufactures and supplies cable assemblies and related components. Although ATE manufactures the majority of its goods in Germany, it operates an office in the United States located in Canton, Michigan. The office handles customer service, engineering, and quality control for ATE and processes sales, purchase confirmations, and invoices for ATE's United States operations. The Canton office does not manufacture any goods for ATE.

1

CSS, which is based in Maryland, designs and manufactures cellular and PCS antennae. In 2004, CSS informed Softronics, Ltd. ("Softronics"), a company based in Cedar Rapids, Iowa, that it was searching for components for its cellular towers. On September 24, 2004, Brian Klosterman, an employee at Softronics, sent an inquiry to ATE via its global website. Mr. Klosterman requested samples of ATE connectors that he believed might be suitable for CSS's project. The inquiry was routed to Fred Bolick, ATE's Major Account Manager in ATE's Canton, Michigan office. Mr. Bolick contacted Mr. Klosterman at Softronics, who provided Mr. Bolick with contact information for Dave Sobczak, an employee at CSS. Mr. Bolick then directly contacted Mr. Sobczak at CSS.

In October 2004, Mr. Bolick requested and was granted permission to visit CSS's offices in Maryland to discuss the application of ATE's components with CSS's antennae. No contract was formed at that time. Following this visit, however, Mr. Bolick continued negotiations with CSS over the telephone, via e-mail, and through facsimile transmissions between ATE's Michigan office and CSS's Maryland office. In late 2004, CSS began placing purchase orders for various ATE components with Mr. Bolick. ATE responded to each of these orders by sending a purchase confirmation form to CSS's billing department. The parties conducted business through this purchase order, purchase confirmation arrangement until April 2005, when they signed an Inventory and Supply Agreement. Even after April 2005, however, the parties continued to conduct business through the purchase order, purchase confirmation system. During the course of their dealings, ATE representatives made four additional trips to CSS's office in Edgewood, Maryland.

In 2006, CSS began experiencing cellular site failures where ATE cables were installed. CSS alleges that these failures were caused by the infiltration of water into ATE's cables despite ATE's assurance that its components would remain watertight even after exposure to normal weather cycles. On July 30, 2009, CSS commenced this civil action against ATE. On June 7, 2010, ATE filed a motion to dismiss CSS's complaint. CSS has opposed the motion.

## ANALYSIS

### A.  Personal Jurisdiction[1]

ATE has moved to dismiss CSS's complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The plaintiff bears the burden on a 12(b)(2) motion to prove grounds for jurisdiction by a preponderance of the evidence. *See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Cntrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). If, as in this case, the court does not hold an evidentiary hearing, then the plaintiff must only make a *prima facie* showing of personal jurisdiction. *Id.* In making its jurisdictional determination, the court shall draw all reasonable inferences in favor of the plaintiff. *Id.*

A federal court may exercise personal jurisdiction over a nonresident defendant if the exercise of jurisdiction is authorized under the state's long-arm statute and comports with the due process requirements of the Fourteenth Amendment. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Because Maryland's long-arm statute extends personal jurisdiction to the full extent allowed by the Due Process Clause, *see Androutsos v. Fairfax*

---

[1] CSS objects to the admission of Mr. Bolick's Declaration for any purpose in this case, including ATE's motion to dismiss for lack of personal jurisdiction. Mr. Bolick executed his declaration on June 3, 2009, but has since passed away. (*See* Def.'s Mot. to Dismiss at 3 n.3.) As a result, CSS contends that Mr. Bolick's declaration is hearsay and that it is "ATE's burden to establish that the Bolick Declaration meets the standard for admitting hearsay under the 'Residual Exception' to the hearsay rule, FRE 807." (Pl.'s Opp'n at 3-4.) Because the question of personal jurisdiction can be decided based on undisputed facts, the court will not address CSS's objection to Mr. Bolick's Declaration at this time.

3

*Hosp.*, 594 A.2d 574, 576 (Md. 1991), the two inquiries merge into one. *Carefirst*, 334 F.3d at 396-97 (citing *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir. 1996)). A plaintiff, however, must first identify a specific statutory provision authorizing jurisdiction. *See Johansson Corp. v. Bowness Construction Co.*, 304 F. Supp. 2d 701, 704 (D. Md. 2004).

CSS relies on two provisions of the Maryland long-arm statute to assert personal jurisdiction over ATE. The first provides personal jurisdiction over a person who "transacts any business or performs any character of work or service in the State." MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b)(1). The second provides personal jurisdiction over a person who "contracts to supply goods, food, services, or manufactured products in the State." *Id.* at § 6-103(b)(2). A plaintiff must satisfy only one provision for the court to exercise jurisdiction. *See Bahn v. Chicago Motor Club Ins. Co.*, 634 A.2d 63, 67 (Md. Ct. Spec. App. 1993). Under § 6-103(b)(1), a defendant need not ever be physically present in the state for a court to exercise jurisdiction under the state's long-arm statute. *Id.* The defendant's actions must only "culminate in purposeful activity within the State." *Id.* (internal quotation marks and citation omitted). Moreover, it is well-settled that § 6-103(b)(1) provides jurisdiction to the full extent permitted by due process. *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002). Because the court finds that ATE's contacts with Maryland satisfy § 6-103(b)(1) and due process, as will be discussed below, it will not address the second long-arm statutory provision relied upon by CSS.

To satisfy due process, a defendant must have sufficient "minimum contacts" with the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two different approaches to determining the extent of the state's jurisdictional power: specific

jurisdiction and general jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002). In cases where the defendant's contacts with the state are themselves the basis for the lawsuit, those contacts may establish specific jurisdiction. *Id.* at 712. By contrast, if the defendant's contacts are not the basis for the lawsuit, then the defendant's continuous and systematic, but unrelated, contacts with the state may establish general personal jurisdiction. *Id.* CSS does not argue that ATE is subject to general personal jurisdiction in Maryland. Accordingly, the court need only address whether ATE is subject to specific jurisdiction. *See Carefirst*, 334 F.3d at 397. To determine whether the exercise of specific jurisdiction exists, a court considers: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* (citing *ALS Scan*, 293 F.3d at 711-12.)

      1.    *Purposeful Availment*

When determining whether a defendant has purposefully availed itself of the privilege of doing business in the forum state, courts consider a variety of factors, including:

> [1] whether the defendant maintains offices or agents in the forum state; [2] whether the defendant owns property in the forum state; [3] whether the defendant reached into the forum state to solicit or initiate business; [4] whether the defendant deliberately engaged in significant or long-term business activities in the forum state; [5] whether the parties contractually agreed that the law of the forum state would govern disputes; [6] whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; [7] the nature, quality and extent of the parties' communications about the business being transacted; and [8] whether the performance of the contractual duties was to occur within the forum.

*Consulting Engineers Corp.*, 561 F.3d at 278 (internal citations omitted). An essential factor in determining whether business negotiations give rise to specific jurisdiction is "whether the

defendant initiated contact." *Costar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 766 (D. Md. 2009) (citing *Giannaris*, 219 F. Supp. 2d at 692).

Although ATE does not maintain an office in Maryland or own property in the state, the record shows that ATE reached into the forum state to initiate business with CSS in late 2004. CSS informed Softronics that it was seeking components for its cellular towers. Softronics, acting as a type of broker, then sent an inquiry to ATE about the compatibility of its components with CSS requirements. In response to this inquiry, ATE's representative, Mr. Bolick, called Softronics and was provided with contact information for Mr. Sobczak at CSS. (*See* Def.'s Mot. to Dismiss at 4; Bolick Decl. ¶¶ 4-6.) While ATE is careful to avoid explicitly stating that Mr. Bolick first contacted Mr. Sobczak, rather than the other way around, on this record the most reasonable interpretation is that ATE initiated business with CSS.

Other contacts also support the assertion of jurisdiction over ATE. The undisputed facts show that Mr. Bolick visited CSS's office in October 2004. (*See* Bolick Decl. ¶ 7.) Mr. Bolick also admits that (1) he carried out all of his negotiations with CSS by directly communicating with CSS's offices in Maryland; (2) the purchase orders sent by CSS to ATE stated that ATE's components were to be shipped to CSS locations in either Abington, Maryland, or Edgewood, Maryland; (3) ATE representatives made four additional trips to CSS's offices in Maryland; (4) CSS's purchase orders were sent from its Maryland offices to ATE's office in Canton, Michigan; and (5) ATE's Canton office mailed order confirmations to CSS's offices in Maryland. (*Id.* ¶¶ 8, 9, 14, and 25.) These contacts, taken together, are sufficient to show that ATE purposefully availed itself of the privilege of doing business in Maryland. *See, e.g.*, *Bahn*, 634 A.2d at 68

(concluding that jurisdiction was appropriate because the defendant sent mail to the plaintiffs in Maryland, contracted with them, and received payments sent by the plaintiffs from Maryland).[2]

### 2. *Arising Out of Activities Directed at the State*

In the Fourth Circuit, a breach of contract claim may arise out of contacts with a forum state where a meeting in the state is "the genesis of [the] dispute." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295 (4th Cir. 2009) (concluding that the plaintiff's breach of contract claim arose out of business transactions directed at Virginia because the defendant's visit to the state prompted the parties to enter into the contract, the defendant visited the forum state on at least one other occasion, and the defendant corresponded and collaborated with the plaintiff in Virginia for several years). ATE contends that CSS's claims arise out of contacts with Michigan, not Maryland, because "[a]ll of the purchases and sales activities took place in Michigan, not Maryland" and because no goods were shipped to Maryland.[3] (Def.'s Mot. to Dismiss at 20.) While ATE may be correct that CSS's claim has substantial connections to Michigan, the breach of contract claim also has substantial connections to Maryland. Mr. Bolick's visit to CSS's office in Maryland was the "genesis" of the eventual dispute between the parties. Only after his visit to Maryland did CSS agree to order components from ATE. ATE employees also made at least four additional visits to CSS offices in Maryland and conducted

---

[2] ATE argued in its briefing that it was not foreseeable ATE would be hailed into court in Maryland because it did not know that its products would end up in or be installed in cellular towers in Maryland. (*See* Def.'s Mot. to Dismiss at 17.) At oral argument, however, ATE conceded it had knowledge that its products would be shipped into Maryland. The location where the parties contemplated the subject of a contract would be performed may be considered in determining whether personal jurisdiction exists. *See, e.g.*, *Nueva Engineering, Inc. v. Accurate Elec., Inc.*, 628 F. Supp. 953, 955 (D. Md. 1986). Thus, ATE's knowledge that its products would be shipped into Maryland supports the exercise of personal jurisdiction here.

[3] ATE shipped its components "FOB" to Nogales, Arizona, from where they were shipped to Maryland. (Bolick Decl. ¶ 5.)

additional negotiations with CSS by telephone calls, e-mails, and facsimiles directed at Maryland. Accordingly, CSS's claim arises out of activities directed at Maryland.

### 3. *Constitutional Reasonableness*

The constitutional reasonableness inquiry is aimed at determining whether litigation in the forum state is "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst.*, 551 F.3d at 296 (internal quotation marks and citation omitted). Under this prong, the court may consider various "additional factors to ensure the appropriateness of the forum," including the following:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Consulting Engineers Corp.*, 561 F.3d at 279 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). In *CFA Inst.*, the Fourth Circuit held that the exercise of personal jurisdiction over the Indian defendant was reasonable because (1) it had hired local counsel; (2) it was reasonably foreseeable that the company could be subject to suit in Virginia based on its dealings with the Virginia plaintiff; (3) Virginia has a "valid interest in the resolution of the grievances of its citizens and business, particularly when they potentially involve issues of Virginia law," 551 F.3d at 297; and (4) the plaintiff had "a valid and substantial interest in having its legal rights recognized and vindicated." *Id.*

The exercise of personal jurisdiction over ATE is constitutionally reasonable. ATE has hired local counsel and, as discussed above, it was reasonably foreseeable that the company would be subject to suit in Maryland based on its dealings with CSS. Finally, Maryland

has an interest in resolving this dispute because CSS is a Maryland corporation and the alleged breach of contract occurred in the state.

For the foregoing reasons, the exercise of personal jurisdiction over ATE comports with due process. Accordingly, the defendant's motion to dismiss for lack of personal jurisdiction will be denied.

### B. Forum Selection Clause

ATE also has moved to dismiss CSS's complaint based on a forum selection clause contained in its General Conditions for the Supply of Products and Services of the Electrical and Electronics Industry ("General Conditions"). A motion to dismiss based on a forum selection clause is treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue. *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006). Treating a motion to dismiss based on a forum selection clause under 12(b)(3) "allows the court to freely consider evidence outside the pleadings." *Id.* at 549-50.

The forum selection clause contained in ATE's General Conditions states: "If the Purchaser is a businessperson, sole venue for all disputes arising directly or indirectly out of the contracts shall be the Supplier's place of business. However, the Supplier may also bring an action at the Purchaser's place of business."[4] (General Conditions, art. XII., Def.'s Mot. to Dismiss, Ex. 2.) ATE contends that its contract with CSS was subject to this forum selection clause because ATE's purchase confirmation forms referenced the General Conditions. CSS argues that it was never aware of ATE's General Conditions and never agreed to the forum selection clause contained in the General Conditions.

---

[4] The Supplier's, or ATE's, place of business is Canton, Michigan.

The parties agree that the United Nations Convention on the Contract for the International Sale of Goods ("CISG"), 15 U.S.C.App., 52 Fed. Reg. 6262 (March 2, 1987), governs the question of whether the forum selection clause is binding upon CSS. Under the CISG, "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." CISG, art. 19(1). If, however, the additional or different terms contained in the purported acceptance *do not* materially alter the terms of the offer, and if the offeror fails to object without undue delay, then the terms of the contract include the additional or different terms contained in the acceptance. CISG art. 19(2). The CISG defines additional or different terms that materially alter an offer to include terms relating to "price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the *settlement of disputes*." CISG, art. 19(3) (emphasis added).

CSS contends that the April 2005 "KANBAN" Agreement signed by the parties memorialized their business relationship and represents the sole contractual agreement between CSS and ATE. Because the KANBAN Agreement did not reference the General Conditions, CSS argues that the forum selection clause never became part of their contract. The KANBAN Agreement, however, contains only terms relating to inventory, replenishment, and delivery specifications. (*See* Inventory & Supply Agreement, Def.'s Mot. to Dismiss, Ex. 3.) No information regarding price or quantity is included in the KANBAN Agreement. Moreover, the parties continued to carry on their business dealings through their purchase order and purchase confirmation arrangement even after signing the KANBAN Agreement. Thus, the court finds

that the KANBAN Agreement was intended by the parties to serve as a supplemental agreement between the parties, not to memorialize their entire contractual relationship.

Instead, it appears that the parties formed multiple, separate contracts with each other through their purchase order, purchase confirmation arrangement. Pursuant to this arrangement, CSS would send a purchase order form to ATE's office in Canton, Michigan. (*See* Bolick Decl. ¶ 8.) The parties agree that this constituted an initial offer to purchase components from ATE. In response, ATE would send a purchase confirmation form, which included a reference to ATE's General Conditions, back to CSS. (*Id.*) Under the CISG, ATE's purchase confirmation form did not constitute an acceptance of CSS's offer because ATE's General Conditions included terms, such as the forum selection clause, that related to the settlement of disputes. Thus, by including the General Conditions in its purchase confirmation form, ATE materially altered CSS's offer. Accordingly, ATE's purchase confirmation form constituted a counteroffer.[5] *See* CISG, art. 19. ATE contends that CSS then accepted its counteroffer, including the forum selection clause, by receiving its components and paying for the goods. CSS argues that, although it accepted ATE's components, it did not accept the General Conditions for two reasons: (1) under the CISG, a party's express acceptance to a forum selection clause contained in a order confirmation form is necessary for it to become part of a contract, and (2) the language on ATE's purchase confirmation form was not sufficient to put CSS on notice that ATE intended to incorporate the General Conditions into their contract.

CSS relies on two cases to support its argument that a forum selection clause contained in a seller's order confirmation form does not become part of a contract unless the buyer

---

[5] Even if the General Conditions did not materially alter CSS's offer under the Article 19 of CISG, the General Conditions would have become part of the contract because CSS did not object to the additional terms without undue delay. *See* CISG, art. 19(2).

affirmatively assents to the provision. *See Chateau des Charmes Wines Ltd. v. Sabaté USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003) (holding that a seller's inclusion of a forum selection clause in its invoice and the buyer's failure to object did not mean that the clause became part of the contract); *Solae, LLC v. Hershey Canada Inc.*, 557 F. Supp. 2d 452, 457-458 (D. Del. 2008) (concluding that a forum selection clause did not become part of the contract even though multiple invoices and confirmations contained the Conditions of Sale because the buyer never affirmatively assented to the proposed modification). In both of these cases, however, a purchase order and purchase confirmation form did not form the basis of the contract between the parties, as is the case here. Instead, the parties in *Chateau des Charmes Wines* and *Solae* had formed an oral agreement relating to the price and quantity terms of the contract prior to the exchange of purchase orders and purchase confirmations. The court in both cases, therefore, treated the seller's invoice containing the forum selection clause as a proposal to modify the oral contract already established by the parties. *See Chateau des Charmes Wines*, 328 F.3d at 531; *Solae*, 557 F. Supp. 2d at 458. Under the CISG, modification of a contract requires the agreement of both parties. *See* CISG, art. 29(1). Because the buyer in each case did not affirmatively assent to the modification, both courts held that the forum selection clause did not become part of the parties' contract. In contrast, at least on the present record, CSS and ATE did not have an existing oral or written contract when ATE sent its order confirmation form to CSS. The order confirmation, therefore, was not a proposed modification that would require CSS's affirmative assent under the CISG. As discussed above, it was a counteroffer that CSS accepted. Thus, these cases do not support CSS's argument that affirmative acceptance was necessary for ATE's forum selection clause to be part of their contract. Whether the language in ATE's purchase confirmation form

was sufficient to put CSS on notice that ATE intended the General Conditions to apply, however, is a separate question.

Article 8 of the CISG provides that "[f]or the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was." CISG, art. 8(1). Statements made by a party are interpreted according to the understanding of a reasonable person, and "[i]n determining the intent of a party or the understanding a reasonable person would have had, due consideration is given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." CISG, art. 8(2)-(3). Based on the facts currently on the record, the court cannot conclude that CSS knew or should have known that ATE intended the General Conditions to apply to their contract.

First, the language referencing ATE's General Conditions was insufficient to put CSS on notice that ATE intended to incorporate the General Conditions into its contract. ATE's purchase confirmation form does not mention a forum selection clause on its face. Instead, page two of ATE's purchase confirmation form states:

> May we point out that for all deliveries and services only the known general conditions of supply and delivery for products and services of the electrical industry (ZVEI) in their latest editions are valid.
>
> . . . .
>
> Please take note:
>
> According to our general conditions for the supply of products and services to the electrical and electronics industry based on the [ZVEI] from Jan. 2002, we allow, as a supplier of components, defect claims up to 12 months after the date of the transfer of risk.
>
> Our general conditions of delivery can be viewed or downloaded as .pdf file from our homepage: http://www.amphenol.de.

(*See* ATE Purchase Confirmation, Def.'s Mot. to Dismiss, Ex. 2.)

This language is ambiguous at best. The phrase "may we point out" is neither clear nor specific regarding ATE's intent that the General Conditions should control the terms of the sale. The ambiguity of the language referencing the General Conditions is further highlighted by the specificity of the surrounding language in the purchase confirmation form. The language alerting buyers to ATE's limitation on defect claims states: "[a]ccording to our general conditions for the supply of products and services to the electrical and electronics industry based on the [ZVEI] from Jan. 2002, we allow, as a supplier of components, defect claims up to 12 months after the date of the transfer of risk." (*Id.*) This language is unambiguous. Indeed, in an abundance of caution, CSS filed separate actions against ATE and Amphenol Corporation, an affiliate of ATE, to ensure that it preserved its claim against both entities in accordance with ATE's clear statement regarding its limitation on defect claims. Compared with this unambiguous language, the court cannot conclude that CSS should have been aware from the broad language referencing the General Conditions that ATE intended to incorporate them into their contract.

Second, there is no evidence on the record to show that ATE had actual knowledge of ATE's General Conditions. The record shows that ATE sent its purchase confirmation forms directly to CSS's billing department, where no one with authority to enter into, modify, or otherwise accept any contracts worked. (*See* Sobczak Aff. ¶¶ 12-13.) Both David Sobczak and Keith Barbalace, two CSS representatives responsible for negotiating with ATE, stated that ATE's General Conditions were never discussed during their negotiations and that they did not become aware of them until the defendant filed its motion to dismiss. (*See id.* at ¶ 9; Barbalace

Aff. ¶ 8.) Thus, at this time, the court cannot conclude that CSS had knowledge that ATE intended to incorporate its General Conditions into their contract.

Accordingly, on the present record, the defendant's motion to dismiss for improper venue will be denied without prejudice. If further evidence is developed during discovery demonstrating the terms of the contracts and whether CSS had knowledge of ATE's intent, then the court may reconsider the defendant's motion. *Cf. Belcher-Robinson, L.L.C. v. Linamar Corp.*, 699 F. Supp. 2d 1329, 1338 (M.D. Ala. 2010) (explaining that, under the standard for ruling on a motion to dismiss and based upon the evidence on the record at the time, the court could not conclude that the forum selection clause was part of the contract).

### C. Transfer and the Doctrine of *Forum Non Conveniens*

As an alternative to its motion to dismiss, ATE has moved to transfer venue to the Eastern District of Michigan or for a dismissal pursuant to the doctrine of *forum non conveniens*, which allows a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil v. Gilbert*, 330 U.S. 501, 507 (1947), *superseded on other grounds by* 28 U.S.C. § 1404. The Supreme Court has explained that "the central focus of the *forum non conveniens* inquiry is convenience." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 248 (1981). Even where venue is proper, the court may nevertheless transfer venue in a civil action for the convenience of the parties and witnesses and in the interests of justice to any district where the case might have been brought. 28 U.S.C. § 1404(a). A court must consider the following factors when considering a motion to transfer venue: "(1) the weight accorded the plaintiff's choice of venue, (2) witness convenience and access, (3) convenience of the parties, and (4) the interests of justice." *Davis Media Group, Inc. v. Best Western Int'l, Inc.*, 302 F. Supp.

15

2d 464, 470 (D. Md. 2004) (citing *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002)).

To determine whether a forum non conveniens dismissal is appropriate, federal courts should evaluate both private and public factors. The relevant private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining willing witnesses; and (4) other practical problems involving efficiency and expense of trial. *See Gulf Oil*, 330 U.S. at 508-09. A primary concern when evaluating the private factors is to ensure that the plaintiffs did not select an inconvenient forum for the purpose of harassing the defendants. *See, e.g.*, *Ferruzzi Italia, S.p.A v. Trade & Tansp., Inc.*, 683 F. Supp. 131, 135 (D. Md. 1988) (citing *Piper Aircraft*, 454 U.S. at 249 n. 15). The public interest factors consist of the: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided "at home;" (3) interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) avoidance of unnecessary problems of conflict of laws, or in the application of foreign law; and (5) unfairness of burdening citizens of an unrelated forum with jury duty. *See Gulf Oil*, 330 U.S. at 508-509.

ATE argues that venue is more appropriate in Michigan because witnesses and documents are located in Michigan, transfer would facilitate access to evidence, and it would be "doubly" inconvenient to have ATE witnesses who must travel from Germany to the U.S. to appear in Maryland, rather than in Michigan. ATE does not, however, identify with particularity any material witnesses who are located in Michigan. Indeed, the only witness ATE refers to is Mr. Bolick, who is now deceased. Likewise, ATE fails to specify why transferring venue to

Michigan will facilitate access to evidence, especially when the majority, if not all, of CSS's documents are located in Maryland. ATE also provides no reason why it would be more inconvenient for witnesses from Germany to travel to Maryland, rather than Michigan, beyond the fact that ATE has an office in Michigan. For these reasons, transferring this case to the Eastern District of Maryland would merely "shift the balance of inconvenience" to CSS. *See Tech USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 861 (D. Md. 2009).

A dismissal on *forum non conveniens* grounds is unwarranted for many of the same reasons a transfer of venue to Michigan is inappropriate. ATE has not demonstrated that dismissing the case in favor of Michigan would do more than shift the inconvenience of the litigation onto CSS. Because federal law governs this case, Michigan would apply the same law as this court. Moreover, a significant part of the parties' contract negotiations took place in Maryland and at least some of ATE's components, the subject of this controversy, are located in Maryland. Thus, Maryland has an interest in deciding this controversy "at home." Accordingly, the defendant's motion to transfer or, in the alternative, for dismissal based on the doctrine of *forum non conveniens* will be denied.

## **Conclusion**

For the foregoing reasons, the defendant's motion to dismiss for lack of personal jurisdiction, motion to transfer venue, and motion to dismiss based on the doctrine of *forum non conveniens* will be denied. The defendant's motion to dismiss for improper venue will be denied without prejudice.

A separate Order follows.


February 8, 2011                              /s/
Date                                          Catherine C. Blake
                                                  United States District Judge